## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## HOT SPRINGS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 6:19-CR-60008-001 |
| | ) | |
| JARRAD OMAR LOCK | ) | |

### **DEFENDANT'S SENTENCING MEMORANDUM**

COMES NOW the Defendant, **Jarrad Omar Lock,** by the Office of the Federal Public Defender and its attorney, **Alex Wynn**, and does hereby respectfully move this Court as to the following: to deny application of the base-offense level of 35, which is based upon unreliable and untested drug quantities prior to the instant conduct; and for a downward variance from the advisory Guideline imprisonment range.

### **Preliminary Conclusions**

Mr. Lock asks this Court to decline to apply the base-offense level of 38, which attempts to hold Mr. Lock accountable for 94 kilograms of unseized, unseen, and untested methamphetamine. (Presentence Investigation Report "PSR" Doc 33, ¶ 30, 31). That quantity corresponds to a presumptive methamphetamine mixture base offense level of 35. U.S.S.G. § 2D1.1(c)(1). This drug quantity was derived solely from statements Mr. Lock made in a post-Miranda interview with Homeland Security agents, in which Mr. Lock inflated his involvement with methamphetamine sales in an attempt to make himself more useful to agents in the hopes of receiving acceptance of responsibility, as it was explained to him by those agents. These unseized and untested drug amounts add approximately 11 to 14 years to Mr. Lock's sentence. An increase in punishment of this magnitude is unwarranted. Mr. Lock accepts that he is responsible for the methamphetamine amounts associated with the counts of conviction. Further, Mr. Lock requests

that this Court grant a traditional downward variance from the advisory Guideline Range, as it is warranted and would allow imposition of a sentence sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

### I. Untested Drug Quantities Derived From Statements Made to Agents

Use of unseized, unseen, and untested drug amounts would increase Mr. Lock's attributable drug quantity substantially, unfairly subjecting him to a Guideline Range that is approximately 4.5 to 5.5 times the range that would be based upon the tested drug amounts seized during his three controlled drug sales.

Mr. Lock's uncounseled statements were made as a result of a misguided perception that he would help himself by "cooperating" although there was no formal agreement. While this drug quantity is based on his own statements, the amounts are inflated and are not based upon reliable measurements. The quantity of drugs seized and sold during all of Mr. Lock's controlled buys are not consistent with his statements purporting to sell three to five pounds of methamphetamine per week. No other drug amounts were actually recovered from Mr. Lock, his shop, or his truck at the time of his arrest, nor from his place of residence. No other lab results were requested or obtained. No search warrant, or return on search warrant was provided to defense counsel that yielded any additional methamphetamine. No testimony by any co-defendant was provided to defense counsel.

A search of Mr. Lock's shop was executed in November 2018, with which Mr. Lock was compliant.  No drugs, paraphernalia, guns, or any other illegal items were found during this search. What was found during this search was $410.00 on Mr. Lock's person and $8,000.00 in Mr. Lock's truck, which has since been added to the PSR. What has not been added to the PSR are the bank documents that were later provided by Mr. Lock's mother, Cindy Lock, to show that she had withdrawn that money on October 30th, 2018, and her explanation that she had given that money

to Mr. Lock for the purpose of him purchasing a large trailer for his business of hauling cars for which he operated a shop. Those bank documents are attached herein (Exhibit 1). After providing that documentation, the money that was seized was then released back to Ms. Lock.

Mr. Lock was not arrested until March 25, 2019, and no illegal activity was recorded by Mr. Lock since the last controlled buy on October 9, 2018.  If the statements set out in Paragraph 30 of the PSR were true, it would mean that he continued to sell three to five pounds of methamphetamine after the three controlled buys from the Government taking place from July, 2018 to October 2018, after the search of his shop in November 2018, and for five more months while under investigation, and very likely heavy surveillance, without the Government collecting any evidence to support it. Further, Mr. Lock was released on April 1, 2019 on pretrial release and had no violations at any point during his release of approximately 50 days.  Mr. Lock appeared as ordered by the Court to his change of plea hearing, held May 20, 2019, at which time he was taken into custody.

During Mr. Lock's post-Miranda interview, the Governments' agents told Mr. Lock that an admission of his and others' bad acts to the agents would be considered acceptance of responsibility, and that the United States Attorney would likely only be interested in offering him safety valve or a 5k if Mr. Lock had acceptance of responsibility on the front end. This pressure to provide meaningful information to officers in exchange for any future considerations from the Government is what caused Mr. Lock to make the exaggerated statements, which contradicts what all other evidence collected by the Government shows in this case. Mr. Lock's uncounseled statements were made as a result of a misguided perception that he would help himself by "cooperating," although there was no formal agreement.

Mr. Lock also stated that he only sold to five or six people total, and if the CI is to be counted as one of these people, the amount of methamphetamine being purchased by the CI, using the largest amount sold by Mr. Lock (34.9065 grams), would only account for 2.5652% of what Mr. Lock claimed to sell per week if he sold three pounds per week, or 1.5391% if he sold five pounds per week. The other four or five buyers would have to be purchasing the other 97.4348% to 98.4609%, which is 2.9230 pounds, if he was selling three pounds per week, or 4.9230 pounds if he was selling five pounds per week. The CI's surveillance footage shows no evidence of Mr. Lock possessing that much methamphetamine, with the largest shown amount of methamphetamine possessed by Mr. Lock fitting into a single Solo cup.

Despite Mr. Lock's statements, mere exaggeration or "puffing" by a defendant to impress the Government's agent is insufficient. E.g., U.S. v. Ortega, 150 F.3d 937, 949 (8th Cir. 1998) (Bright, J., concurring). In resolving any dispute concerning a factor important to the sentencing determination, the Court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy. See, § 6A1.3(a). Mr. Lock objects to the inclusion of these drug amounts as they are remote in time to the instant offense and any alleged drugs were not tested by the crime laboratory. Based upon the readily provable amount of methamphetamine collected by the Government, Mr. Lock humbly asks this Court to apply the base offense level of 24.

Mr. Lock recognizes that the Court may assess the credibility of these statements to the agents in determining whether to tie him to these unseized drug quantities. However, even if the Court is inclined to leave such amounts in place, the Court has significant discretion to impose a reasonable sentence and find that this base-offense level is greater than necessary to achieve the

4

goals of sentencing. In *United States v. Atterberry*, 775 F.3d 1085, 1090 (8th Cir. 2015), the district court varied downward by 120 months from 360 months to 240 months. "[T]he district court exercised its discretion to impose a sentence below what the advisory Guidelines recommended for the very reason Atterberry suggests: that drug quantity was based on an estimate that was greater than necessary to meet the goals of the sentencing." *Id*.

II. **A Traditional Downward Variance From the Advisory Guideline Range is Warranted and Would Allow Imposition of a Sentence Sufficient, But Not Greater Than Necessary, to Satisfy the Purposes of Sentencing**

Nature and Circumstance of the Offense

While the nature of any drug offense is serious, the circumstances surrounding Mr. Lock's offense are not extraordinary. Mr. Lock has never been convicted of any felony prior to this arrest, and has no prior arrests for a controlled substance offense, methamphetamine or otherwise. Not a single controlled purchase even amounted to a single kilogram of methamphetamine. In fact, the lab results of three buys did not even total a tenth of one kilogram of methamphetamine. All controlled buys took place at Mr. Lock's shop in Malvern, Arkansas, which was several miles away from his home and his children. There is no evidence of any use or presence of firearms during any of the controlled buys that took place. There was no threat of violence or intimidation during any of the controlled buys. Mr. Lock was submissive to police officers not only at the time of his arrest, but also during the search of his shop in November 2018.

History and Characteristics of the Defendant

Jarrad Lock was born in May of 1984 to Cindy Lock and Wilbert Riggins (Riggins). Riggins was not around during much, if any, of Mr. Lock's childhood, and he has always carried a deep appreciation of his mother for raising him. Though his stepfather has been involved with his mother since he was young, Mr. Lock has long felt the sting of abandonment by his biological

5

father. He has recently reconnected with Riggins, in an attempt to have another opportunity at a relationship with his father.

Although Mr. Lock does not struggle with a methamphetamine addiction, he has long battled alcoholism. The pressures of supporting his family with a modest income is what has fueled both his need to drink and to sell drugs to supplement his income. Mr. Lock has taken this arrest as his wake up call for both of those vices, and realizes that he has not been leading the life he wants his children to know he lead. Mr. Lock has had no issues, disciplinary or otherwise while being held in federal custody, nor did he have any violations during his pretrial release. Mr. Lock has a history of working in many workplaces, including assisted living centers, lawn services, auto shops, and call centers. Mr. Lock also received a commercial driver's license in the past, and he plans to use that experience and knowledge to rejoin the workforce upon his release.

Just Punishment

Mr. Lock's sentence should promote respect for the law, but it should also provide a sentence that is sufficient but not greater than necessary. A sentence well below the Guideline Range would have a great impact on Mr. Lock, who up until this arrest had not spent any time imprisoned, other than a morning to sober up following a public intoxication. To increase his sentence due to unseized, unseen, and untested drug amounts would not be just punishment—it is overly punitive. It would not deter others, nor would it rehabilitate Mr. Lock. When he is released from prison, he will be under supervision and if he commits another crime, he will return to prison. Mr. Lock is 35 years old, and facing his first serious conviction of any kind; he is deserving of a second chance to redeem himself.

Mr. Lock has not spent an entire day imprisoned in his life prior to the instant offense. He has been in Ouachita county jail since May 20, 2019, having spent an additional week there before his detention hearing.

A sentence remarkably below Mr. Lock's Guideline Range as indicated in the PSR, and even below what his Guideline Range would be without the application of a base offense level of 38, would suffice as just punishment in Mr. Lock's case.

Adequate Deterrence/Protect the Public

As mentioned above, this is the first time that Mr. Lock has ever been convicted of such a serious crime. It is not often that this Court deals with people that are losing their freedoms and so many privileges for the first time in their lives. The impact of Mr. Lock's actions will resound throughout the remainder of his and his family's lives. Any period of incarceration will undoubtedly deter him from such conduct as he is currently serving his longest period of incarceration. Further, any period of imprisonment imposed will protect the community. Mr. Lock has had a considerable amount of time to reflect on his conduct, and the affect it has had on his family. He is truly remorseful. He recognizes that distributing drugs harms others, their families, and the community as a whole. He is committed to a law-abiding life from this point forward.

Treatment/Rehabilitation

Mr. Lock, who has struggled with alcoholism for years, is taking his imprisonment as an opportunity for sober life going forward. He has already made strides, by not succumbing to alcohol during his time on pretrial release. He is committed to using his time at the Bureau of Prisons to better himself and to become a productive member of society. An extended sentence will not further his rehabilitation, it will be solely punitive.  A sentence well below the Guideline Range still affords Mr. Lock the opportunity to accomplish his goals of successfully overcoming

his alcoholism and ensuring he is better prepared for the free world upon release. Any sentence within the erroneously applied Guideline Range would be overly harsh and counter-productive. Mr. Lock has already felt a great sense of remorse for his conduct and has since determined himself to be an example to his family of what redemption can look like. A short sentence for Mr. Lock, who has never served more than a night in jail prior to March, will send a meaningful message to him. The public would be better served by Mr. Lock rejoining society as a crime free, hardworking father to his children, rather than punishing him with a lengthy prison sentence.

Need to Avoid Unwarranted Sentencing Disparities

A sentence within the erroneously applied Guideline Range calculated in the PSR for a total offense level of 35 and criminal history category of I, resulting in a range of 168 to 210 months, is overly harsh and approximately 4.5 to 5.5 times the Guideline Range if Mr. Lock is only assessed a methamphetamine quantity for the seized drugs. If he is only penalized for the seized drug quantities, this leaves him at a total offense level of 21, criminal history category I, resulting in a range of 37-46 months.

It can almost always be assumed that a controlled purchase of drugs by law enforcement is not the first time that a person has ever sold drugs in their lives, and further, that the controlled buys by law enforcement do not encompass all the drug transactions that a person ever engaged in. From a public policy stand point, Mr. Lock, a man without knowledge of the concept of relevant conduct as it exists in the federal courts, gave in to the overwhelming pressures of an interrogation to provide officers with impressive and exaggerated information so that he could potentially lessen his first ever prison sentence. Holding Mr. Lock accountable for the distribution of 94 kilograms of methamphetamine would create a disparity from every other person that has been convicted of

drug distribution and was not held accountable for an estimated total of drug sales for the year leading up to their arrest, simply because they knew better than to give statements to the authorities.

## Conclusion

Therefore, it is Mr. Lock's position that his total offense level must be adjusted to remove the base-offense level for the unseized and untested drug amounts. Further, he requests a downward variance based on the 18 U.S.C. § 3553(a) factors. Based upon the history and characteristics of Mr. Lock, the Guideline Range is significantly longer than what is necessary to protect the public, provide deterrence, and rehabilitate him.

Mr. Lock does have some skills he would like to build on so that when he is released from prison he can lead a productive, crime-free life. He has experience working in assisted living centers, working in the lawn care field, as well as having earned a commercial drivers' license once before. The Court will receive an abundance of letters showing that Mr. Lock has a great support system that will be waiting for him upon his release from prison. Mr. Lock has had a long time for self-reflection during his current incarceration. He is deeply saddened that he is going to have to spend time away from his family. It is his greatest desire to return to them as quickly as possible. He has committed to lead a different life after he is released. He prays that this Court will have mercy on him and recognize that he is redeemable, that he can be rehabilitated, and that he is worthy of leniency.

WHEREFORE, Mr. Lock respectfully requests this Court decline to apply the base offense level of 38, based on untested drug quantities, and grant a downward variance from the advisory Guideline Range.

Respectfully submitted,

BRUCE D. EDDY
FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF ARKANSAS

By:  /s/ Alex Wynn_____
Alex Wynn
Assistant Federal Public Defender
100 E. Peach St., Suite 320
El Dorado, AR 71730
(479) 249-8648

Counsel for Defendant

CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to Ms. Kimberly Harris, Assistant United States Attorney, and a copy of this pleading was mailed by the United States Postal Service to: none.

By:  /s/ Alex Wynn_____
Alex Wynn